02-11-337-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00337-CV


 
 
 In the Interest of R.S.O.C., T.L.-R.C., and
 K.C.-D.E., Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
H.R. (Mother) appeals the termination of her parental rights to her children
R.S.O.C. (Ryan), T.L.-R.C. (Tonya), and K.C.-D.E. (Kevin).[2]  We affirm.

Background Facts

At
the time of trial, Mother was twenty-seven years old.  From age twelve to age
twenty-one, Mother was in a relationship with R.C., the father of her two older
children.  Ryan was born in April 2000, while Mother was still in high school. 
Tonya was born in July 2001.

Mother
began using marijuana when she was eighteen.  She eventually increased her
usage to daily.  In 2002, Mother met K.E., and after a month, the two moved in
together.  In 2003, Mother’s mother (Grandmother), who Mother frequently used
for childcare, had a stroke.  Grandmother’s health deteriorated so that by
August 2004 Grandmother could no longer work.  Mother continued to drop the
children off at Grandmother’s, reasoning that Mother’s brother, who lived in
the same apartment complex as Grandmother, and his girlfriend could help watch
the children.

At
some point in 2004 or 2005, CPS received a referral for physical neglect
regarding the state of Grandmother’s apartment.  The apartment was cluttered,
dirty, smelled like urine, and one of the windows was broken.  Also in 2004,
Mother got into an argument with K.E. and was taken to John Peter Smith
Hospital (JPS) for an evaluation.  She was diagnosed with a mood disorder.

In
May 2005, Mother began using cocaine.  She used “big quantities” because the
people she did drugs with used large amounts of cocaine.  In June 2005, Mother returned
to JPS for another psychiatric evaluation because someone alleged she cut her
wrists.  When Mother returned home from the hospital, she found K.E. and
another woman in her home.  Mother “flipped out” and chased K.E. with a
butcher’s knife.  The other woman jumped out a window.  When the police
arrived, K.E. told them that Mother was trying to harm herself.  K.E. was
arrested and charged with assault bodily injury of a family member.  At some
point after this incident, Mother and K.E. moved to separate residences.

In
November 2005, Mother discovered that she was pregnant.  Mother told K.E. that
she wanted an abortion, and K.E. agreed to take her to her appointment. 
Instead, K.E. took Mother and the children to his house, where he kept them for
three months.  K.E. quit his job in order to constantly watch Mother.  Mother
and the children were scared, and they would hide in the closet.  In February,
Mother and K.E. argued so loudly that a neighbor called the police.  K.E. told the
police that Mother was “crazy,” and Mother was again sent to JPS for an
evaluation.

In
April 2006, Mother was arrested on a theft by check charge from 2005.  The next
month, Mother started using cocaine again.  On May 4, 2006, Mother allegedly
shot at K.E.  On May 15, 2006, K.E. tried to break into Mother’s house with a
gun.

In
June 2006, Kevin was born.  He tested positive for cocaine at birth.  Mother
admitted that she had been snorting cocaine when the contractions began the
night before.  CPS was notified and placed Kevin with Mother’s aunt, Aunt E., in
Louisiana.  Mother voluntarily placed Ryan and Tonya with R.C.’s mother.

On
December 23, 2006, Mother and K.E. got into an argument and Mother broke K.E.’s
car windows with a brick.  She was charged with criminal mischief and sentenced
to thirty days in the Tarrant County Jail.  In October 2007, Mother failed to
show up to labor detail and was returned to jail for another thirty days.  Mother
committed another crime of criminal mischief in March 2008 by breaking the
windows of K.E.’s house after another argument with K.E.; she was again sentenced
to jail for fifteen days.  Also in March 2008, Mother was charged with burglary
of K.E.’s home.  Mother denied that she was responsible, but she pleaded guilty
and received deferred adjudication.

After
Mother was released from jail after pleading guilty, she moved in with a woman,
D.I.  D.I. and Mother both used marijuana.  In March 2009, Mother’s probation was
revoked for repeatedly failing drug tests.  In April 2009, Mother went into the
Substance Abuse Felony Program (SAFP), where she received counseling and
attended a twelve-step program.  In December 2009, Mother got out of SAFP and moved
to a halfway house.

In
January 2010, R.C.’s mother sent Ryan and Tonya to live with Aunt E. in
Louisiana.  R.C. and his fiancée talked to the children often, but they began
to get concerned that the children had not been properly cared for.  Ryan
claimed that Aunt E. locked him in a closet, tied him to a chair, and hit his
hands and feet with a hammer.  R.C.’s fiancée testified that Aunt E. told them
that if they tried to come take the children they would “get shot at.”  They
contacted Louisiana CPS, but they did not receive any help.

In
February 2010, all three children were dropped off at the Arlington CPS office
by a relative.  The children were dirty and had not eaten.  Ryan had bruises,
bite marks, “scattered . . . lesions,” and an abrasion from an iron.  One of
his teeth was cracked.  Tonya had bite marks, burns on her arm, and scratches
and belt loop marks “over various areas of [her] body.”  Kevin had a cut on his
head that had occurred several days prior and had not been treated.  It required
seven stitches.  Ryan was admitted to a psychiatric hospital because he was
banging his head on the bed and wall and saying that he did not want to live
anymore.

Mother
violated her probation in March or April 2010 by using drugs.  Mother tried to
run from the police for about two months, “basically jumping from house to
house.”  She was finally arrested on April 18, 2010 and was sentenced to three
years’ imprisonment.

This
case was originally set for trial in November 2010.  Mother filed a motion for
continuance and for         an extension of the dismissal date because she was
to be released from prison in November and stated that she “[would] be able to
fully comply with the Service Plan.”  The motion was granted and trial was
reset for April 2011.  In November 2010, Mother was released from prison and
put on parole.  In December 2010, the trial court signed an “Order for Actions
Necessary for Parent to Obtain Return of Child.”  Mother got a job at a grocery
store in February 2011, submitted to a psychological evaluation, and
participated in counseling.

On
the day of trial, Mother again moved for a continuance, requesting additional
time to complete her service plan.  The motion was denied and the case
proceeded to a bench trial.

The
trial court found that Mother (1) knowingly placed or knowingly allowed the
children to remain in conditions or surroundings that endangered the physical
or emotional wellbeing of the children, (2) engaged in conduct or knowingly
placed the children with persons who engaged in conduct that endangered the
physical or emotional wellbeing of the children, (3) failed to comply with the provisions
of a court order that specifically established the actions necessary to obtain
the return of the children, and (4) had been the cause of Kevin being born
addicted to alcohol or a controlled substance.[3]

Standard
of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to erase them
permanently—to divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child’s right
to inherit.   Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick, 685 S.W.2d at 20–21; In re R.R.,
294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated subsections (D), (E), (O), or (R)
of section 161.001(1) and that the termination of the parent-child relationship
would be in the best interest of the child.  Tex. Fam. Code Ann.
§ 161.001; In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light
of the entire record, the disputed evidence that a reasonable factfinder could
not have credited in favor of the finding is so significant that a factfinder
could not reasonably have formed a firm belief or conviction in the truth of
its finding, then the evidence is factually insufficient.  H.R.M., 209
S.W.3d at 108.

Discussion

Grounds
for removal

In
Mother’s first, second, third, and fifth issues, she challenges the legal and
factual sufficiency of the evidence supporting the trial court’s findings on
the grounds for termination.  The trial court terminated Mother’s rights based
on four grounds.  In her statement of points, Mother challenged the legal and
factual sufficiency of the evidence supporting the findings that she knowingly
placed or knowingly allowed the children to remain in endangering conditions or
surroundings, that she engaged in conduct or knowingly placed the children with
persons who engaged in conduct that endangered the physical or emotional
wellbeing of the children, and that termination was in the best interest of the
children.  She did not challenge the findings that she failed to comply with
the provisions of a court order that specifically established the actions
necessary to obtain the return of her children or that she had been the cause
of a child being born addicted to alcohol or a controlled substance.

Former
section 263.405(i) of the family code required the appellant to present to the
trial court any issue she intended to appeal in a statement of points.[4] 
See Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen.
Laws 332, 332 (“The appellate court may not consider any issue that was not
specifically presented to the trial court in a timely
filed statement of points on which the party intends to appeal or in
a statement combined with a motion for new trial.”), repealed by Act
effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws
348, 349.  However, following our recent decision in In re A.J.M., No.
02-11-00137-CV, (Tex. App.—Fort Worth July 16, 2012, no pet. h), we will review
Mother’s issues challenging all of the grounds for her termination.

Mother
presents no argument to support her third issue challenging the trial court’s
finding that she was the cause of a child being born addicted to alcohol or a
controlled substance.  See Tex. Fam. Code. Ann. §§ 161.001(R),
261.001(8).  She has thus waived this issue.  See Tex. R. App. P.
38.1(i) (requiring an appellant’s brief to contain clear and concise arguments
“with appropriate citations to authorities”); see also Fredonia State Bank
v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing
the “long-standing rule” that a point may be waived due to inadequate
briefing). 

Even
if she had not waived this issue, there is sufficient evidence to support the
trial court’s finding that Mother was the cause of a child being born addicted
to a controlled substance.  Her own testimony at trial was that her labor was
“cocaine-induced.”  She testified that she had purchased about eight grams of cocaine
the day before she went into labor.  She said, “About mid-way [through the
eight grams], I started having contractions, and so I tried to make them stop. 
I sat in the tub, I stopped getting high, and the next morning, [Kevin] was
born.”  Kevin’s medical records were introduced at trial, and the CPS
conservatorship worker also testified that Kevin tested positive at birth for
cocaine.  We thus overrule Mother’s third issue as to all three children.  See
In re G.E., No. 09-10-00188-CV, 2011 WL 193497, at *3 (Tex.
App.—Beaumont Jan. 20, 2011, no pet.) (mem. op.) (upholding termination of
mother’s parental rights to her three children after “several” of them tested
positive for drugs at birth); In re J.L., No. 04-01-00767-CV, 2002 WL
31059854, at *2 (Tex. App.—San Antonio Sept. 18, 2002, no pet.) (not designated
for publication) (noting that grounds for termination of mother’s two children
“were proved” by evidence that one of the children was born addicted to a
controlled substance); In re M.N.O., No. 09-02-00070-CV, 2002 WL
31835026, at *2 (Tex. App.—Beaumont Dec. 19, 2002, no pet.) (not designated for
publication) (upholding termination of mother’s parental rights to all three of
her children on grounds that she was the cause of her youngest child being born
addicted to cocaine).  Along with a best interest finding, a finding of only
one ground alleged under section 161.001(1) is necessary to support a judgment
of termination.  See In re E.M.N., 221 S.W.3d 815, 821 (Tex. App.—Fort
Worth 2007, no pet.).  Because we overruled Mother’s third issue, we need not
address Mother’s first, second, and fifth issues.  See Tex. R. App. P.
47.1.

Best
interest

In
Mother’s fourth issue, she challenges the legal and factual sufficiency of the
evidence supporting the trial court’s finding that termination of her parental
rights was in the children’s best interest.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1)
the child’s age and physical and mental vulnerabilities;

(2)
the frequency and nature of out-of-home placements;

(3)
the magnitude, frequency, and circumstances of the harm to the child;

(4)
whether the child has been the victim of repeated harm after the initial report
and intervention by the department or other agency;

(5)
whether the child is fearful of living in or returning to the child’s home;

(6)
the results of psychiatric, psychological, or developmental evaluations of the
child, the child’s parents, other family members, or others who have access to
the child’s home;

(7)
whether there is a history of abusive or assaultive conduct by the child’s
family or others who have access to the child’s home;

(8)
whether there is a history of substance abuse by the child’s family or others
who have access to the child’s home;

(9)
whether the perpetrator of the harm to the child is identified;

(10)
the willingness and ability of the child’s family to seek out, accept, and complete
counseling services and to cooperate with and facilitate an appropriate
agency’s close supervision;

(11)
the willingness and ability of the child’s family to effect positive
environmental and personal changes within a reasonable period of time;

(12)
whether the child’s family demonstrates adequate parenting skills, including
providing the child and other children under the family’s care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent
with the child’s physical and psychological development;

(C) guidance and supervision consistent with the child’s
safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even
though the violence may not be directed at the child;  and

(F) an understanding of the child’s needs and
capabilities; and

(13)
whether an adequate social support system consisting of an extended family and
friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the
desires of the child;

(B)     the
emotional and physical needs of the child now and in the future;

(C)     the
emotional and physical danger to the child now and in the future;

(D)     the
parental abilities of the individuals seeking custody;

(E)     the
programs available to assist these individuals to promote the best interest of
the child;

(F)     the
plans for the child by these individuals or by the agency seeking custody;

(G)     the
stability of the home or proposed placement;

(H)     the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(I)      any
excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

The
evidence

At
the time of trial, Ryan was eleven years old, Tonya was nine, and Kevin was
almost five.  See Tex. Fam. Code Ann. § 263.307(b)(1).  Ryan had had
a problem socializing in school for years.  He had been hospitalized twice for
psychological issues.  After the children were dropped off at CPS, they would
lie and steal and Kevin “played in his poop.”  CPS worker Davis testified that
she had gone to the foster house to help deal with disciplinary issues with the
children at least three times and spoken to them on the phone about their
behavior at least twice.

Kevin
had lived with Aunt E. since he left the hospital after his birth.  See id.
§ 263.307(b)(2).  He had never lived with Mother.  Ryan and Tonya
had spent almost half their lives out of Mother’s care.  After they were
removed in 2006, they lived with R.C.’s mother for almost three years and then
with Aunt E. for about a month.  After they were returned to CPS in February
2010, Tonya and Kevin were placed in a foster home and Ryan was placed in a
mental hospital for “several months.”  CPS tried to place all three children in
the same home, but they fought with each other so violently and frequently that
the foster mother asked CPS to take the children back.  Ryan was sent back to
the hospital and then to another foster home, and Tonya and Kevin were placed
back in their first foster home.  Tonya and Kevin moved foster homes two more
times.  Shortly before trial began, all three children were moved to the same
foster home.

CPS
first became involved with Mother in 2004 or 2005 because of the state of
Grandmother’s apartment, where the children stayed while Mother worked.  The
apartment was dirty, smelled of urine, and had a broken window.  Mother voluntarily
placed the children in the care of others after Kevin’s birth.  She did not see
them for about four years, even after learning that they were being abused or
neglected by Aunt E. or learning that they had been deposited at CPS’s office. 
See id. § 263.307(b)(4).  Mother testified that Ryan had
told her that Aunt E. was hurting him.  Mother said that she believed Aunt E.’s
discipline tactics “went too far,” but she only spoke to Aunt E. once about
it.  When Mother and Aunt E. got into an argument over Aunt E.’s actions,
Mother decided not to talk to Aunt E. anymore.  Mother testified that she
contacted CPS in Louisiana and they sent her a letter saying they would
investigate.

Mother
had been evaluated at JPS about four times.  See id. § 263.307(b)(6). 
Mother also submitted to a psychological evaluation as ordered by the trial
court.  In her evaluation of February 24, 2011, the therapist noted that Mother
“lack[ed] insight into her problematic thoughts and behaviors which [had] brought
about her current life circumstances.”  He stated that Mother “maladaptively
copes with stress and pressure via escape and rationalization” and that she
enters into codependent and abusive relationships.  He described a “history of
not learning from strong consequences” and noted that her “decision making and
planning skills are faulty and lack consistency to promote self-growth.”  His
prognosis for Mother was “guarded and will become poor if she does not fully
participate in treatment services.”  His recommendations included medical and
psychiatric evaluations for her depressive symptoms, participation in a
domestic violence support group and a substance abuse support group, and a
sponsor.

Ryan
had been diagnosed with social concerns and a mood disorder.  See id.
§ 263.307(b)(3), (6).  At the hospital, he planned to take a blade
from a pencil sharpener and cut himself with it.  His psychological evaluation
noted that he is impatient, physically overactive, gets distracted easily, and
would leave class without permission.  He is also violent, “spiteful or
vindictive,” and once brought a knife to school.  He told the counselor that he
thinks of himself as “crazy” and “stupid.”

Mother
testified to a history of abuse from K.E.  See id. § 263.307(b)(7). 
She claimed that he started “putting his hands on [her]” while she was pregnant
with Kevin.  She also described an incident where she chased K.E. with a
butcher’s knife because she found him with another woman.  Mother also pleaded
guilty to a deadly conduct charge for a fight with K.E. in 2006 in which she
allegedly had a gun.  Mother denied having a gun, but she admitted to the fight
and a criminal mischief charge.  Also in 2006, Mother threw bricks through the
windows of K.E.’s car because he did not give her money he had promised for the
children’s Christmas gifts.  In 2008, Mother broke the windows of K.E.’s house
because he had gone to her house while she was sleeping and dragged her out of
her bed by her hair.

K.E.
had been arrested twice on assault charges.  Mother testified that K.E. tried
to break into her house, “banging on [her] door with a gun,” while she was
pregnant with Kevin.  Mother testified that K.E. trapped her in his house,
watching her twenty-four hours a day, for three months so that Mother could not
get an abortion.  Although she claimed she was no longer in a relationship with
K.E., there is evidence that she remained in contact with him.

Mother
began using illegal drugs when she was eighteen years old.  See id. § 263.307(b)(8). 
She used cocaine and marijuana throughout her pregnancy with Kevin.  She
testified that she would buy eight grams of cocaine and use it within four
days.  Kevin tested positive for cocaine at birth and Mother admitted that she
had been using cocaine when the contractions started.  She also stated that
while she was using the cocaine, Ryan and Tonya were sleeping.  Mother had her
probation revoked on March 5, 2009 because she had about thirteen failed drug
tests in ten months.  However, Mother had abstained from criminal conduct since
her last release from prison and her drug tests had been negative.

After
Kevin’s birth in 2006, CPS offered Mother parenting classes, a drug and alcohol
assessment, a psychological evaluation, and counseling, but Mother participated
in none of the services.  See id. § 263.307(b)(10).  A CPS
caseworker testified that Mother scheduled her psychological evaluation three
times and failed to show for each appointment.  She initiated her drug and
alcohol assessment but was discharged for noncompliance.  She also continued to
test positive for cocaine and marijuana.  Mother testified that before her children
were removed, she used cocaine recreationally, but after they were removed, she
“started doing it every day[,] all day.”  Mother testified that she learned a lot
from the twelve-step program she participated in as part of SAFP in 2009, but
testified “when you don’t use what you’re taught, it doesn't matter.”

Mother
submitted to a psychological evaluation as ordered by the trial court and attended
individual counseling.  While in prison, Mother completed nine of twelve
parenting classes.  Mother testified that she also went to a six-hour anger
management seminar while in prison.  Mother secured employment at a grocery
store.  She had not completed a drug and alcohol assessment by the time of
trial.  Since moving out of the halfway house until the start of trial (a
period of over four months), Mother went to four NA meetings.  She testified
that she had not yet found a sponsor or started to work the steps, although she
acknowledged that it was critical to her staying off drugs.  She said that she
knows the steps “by heart, but as far as applying them to [her] life, [she does
not].”

At
trial, Mother testified that her cocaine habit “really didn’t affect [her] ability”
to care for her children.  See id. § 263.307(b)(11).  Mother
admitted that she allowed K.E. to control her life and said she would not let
someone do that to her again.  When asked how she thought her lifestyle
affected her children, she said that she did not think they knew she was using drugs. 
In her psychological evaluation of February 24, 2011, she denied that her
children had developmental needs or behavioral problems.  See id. § 263.307(b)(12)(F).

Mother
told her psychologist that she disciplined children by telling them to hold the
arm of the couch and spanking them.  See id. § 263.307(b)(12)(B). 
Mother would leave the children with Grandmother, despite knowing that
Grandmother’s health had deteriorated to the point that she could no longer
work and had difficulty caring for the children.  See id. § 263.307(b)(12)(C),
(D).  Mother claimed that her brother and his girlfriend would care for
Grandmother and the children, but she also admitted that there were many times
that they were not around and Grandmother was the sole caregiver.  Mother
denied that Grandmother’s apartment was endangering, but she admitted that it
was cluttered, the carpet was filthy, and that it smelled like urine.

Mother’s
psychological evaluation noted that she lacked a positive support network.  See
id. § 263.307(b)(13).  R.C.’s fiancée testified that she believed
that Mother was in a position to take care of the children.  But she also
testified that Mother did not have a place to live where she could take the
children.  CPS worker Gale Davis testified that at the beginning of trial, Mother
had not yet obtained suitable housing for the children.  See id. § 263.307(b)(12)(D). 
Mother did get a two-bedroom townhome in the middle of trial.

CPS
worker Davis testified that the children, especially Kevin, were very
stand-offish when they first started their visits with Mother.  See Holley,
544 S.W.2d at 371–72 (looking at the desires of the child).  Although Kevin had
started to engage with Mother, Davis testified that he was disengaged again by
the end of the visit.  Davis reported that Tonya had been acting out sexually
with the other children in her foster home.  See id. (looking at the
emotional and physical needs of the child).  Ryan had also had severe
psychological problems, requiring two hospitalizations.  Davis testified that
the children were not very respectful of authority and described having a
number of disciplinary issues with them.  Tonya’s father R.C. testified that
Tonya used to pee on herself, and he acknowledged that she could be aggressive.

When
the children were left at the CPS office in February 2010, Davis contacted
Mother and told her the children had been “obviously neglected.”  Mother was
running from the police at the time and told Davis that she did not know what
she was going to do about the children and that she would call Davis back.  See
id. (looking at the parental abilities of the person seeking custody).  Mother
did not call back until December 2010.  Davis testified that because the
children were voluntarily placed with Aunt E., Mother could have requested the
children’s return, but she never did.  Davis said that she believed that by
letting the children stay with Aunt E. after it was clear there was abuse or
neglect, Mother allowed the children to stay in dangerous conditions.

Mother
testified that while her children were in Louisiana, she sent them money,
pictures, toys, and Christmas presents.  She said she wrote them three times a
week and called them on Sundays.  When the children came into CPS’s care in
February 2010, Mother did not go see them because she was hiding from the
police.

Mother
testified that she would be able to get insurance for the children through her
employer and that she would be able to apply for food stamps.  See id.
(looking at the programs available to assist the person seeking custody).
Mother said she had looked into daycare and that her sister-in-law was willing
to provide backup daycare.  Mother also testified that her sister-in-law was
legally blind and had her niece and aunt assist her with “[b]asically
everything.”  Davis testified that Mother could be able to receive free child
care and counseling for her and her family.

Mother
testified that Davis told her that Kevin was going to be adopted and that Ryan
would be institutionalized and medicated because of his behavior problems.  See
id.
(looking at the agency’s plans for the child).  However, Davis testified that the
children’s current foster home is dual-licensed and a possible adoptive
placement for the children.  Davis testified that the current foster mother is
doing well with the children but that the children were still adjusting to the
home and being around other children.  R.C.’s mother (Ryan and Tonya’s
grandmother) called CPS asking to have the children placed with her.  Mother
told CPS that was not an option because Mother believed that R.C.’s mother “tried
to set her up and accuse her of kidnapping the children before the children
were actually taken to Louisiana.”  R.C. and his fiancée also testified that
they were willing to take the children.[5]

During
trial, Mother got a townhome, signed up for family violence classes, and made
an appointment for a psychological evaluation.[6] 
However, Mother had four months prior to the beginning of trial to complete
these tasks and she did not do it.  See Smith v. Tex. Dep’t of
Protective & Regulatory Servs., 160 S.W.3d 673, 681 (Tex. App.—Austin
2005, no pet.) (“[I]n considering the best interest of the child, evidence of a
recent turn-around in behavior by the parent does not totally offset evidence
of a pattern of instability and harmful behavior in the past.”).  Mother
testified at trial that she would need another “couple of months” to be in a
position to adequately provide for the children.

Analysis

Davis
testified that CPS believed it was in the children’s best interest to terminate
Mother’s parental rights.  At trial, Mother did not appear to realize the
effects of her drug addiction on her children or express any remorse for
putting them through all the difficulties they had experienced in their short
lives.  See In re J.L.B., 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011,
no pet.) (noting that the parents’ “poor judgment [and] the constancy of their
drug use” weighed in favor of terminating their parental rights).  While she
insisted that she was drug-free at the time of trial and that she regretted using
drugs while she was pregnant, she had relapsed in the past, had no sponsor, and
was not working her twelve-step program.  Further, “evidence of improved
conduct, especially of short-duration, does not conclusively negate the
probative value of a long history of drug use and irresponsible choices.”  In
re J.O.A., 283 S.W.3d 336, 346 (Tex. 2009).  At trial, Mother claimed that
her heavy cocaine intake “really didn’t affect [her] ability” to care for her
children.  The trial court was free to believe that Mother had not made
sufficient progress in handling her drug addiction to indicate that she would be
able to stay clean.

Mother
had been jailed four times since her oldest child was born.  See In re
J.B.W., 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet.
denied) (holding that incarceration is one factor courts can consider when
determining the best interest of a child in a termination case).  She had been
convicted of criminal mischief, theft by check, and burglary of a habitation.  See
R.R.,
294 S.W.3d at 235 (considering evidence of a father’s past convictions
supportive of the trial court’s best interest
finding).  In between incarcerations, Mother was capable of visiting her
children in Louisiana, even retrieving Ryan and Tonya, but she never did.[7] 
Ryan told Mother of the abuse and neglect the children were suffering at the
hands of Aunt E., but Mother let them remain with her.  She could not take her
children when they were returned to CPS because she was evading the police.  During
trial, Mother testified that she would still not be prepared to adequately
provide for the children for another few months.

Although
Mother attended an anger management seminar, she expressed no remorse for the
violent fights in which she had participated in the past.  See In
re Z.C., 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet.
denied) (explaining that a father’s “efforts to improve his ability to
effectively parent on the eve of trial [were] not enough to overcome a decade of
poor parenting and neglect”); In re S.M.L., 171 S.W.3d 472, 480 (Tex.
App.—Houston [14th Dist.] 2005, no pet.) (stating that the father’s
incarceration and pattern of criminal and violent conduct made it likely that
he would face incarceration again in the future).  When asked what she would
have done differently in her life, she stated only that she had learned that
she should not let other people influence her decision-making or control her
behavior.

Ryan
had a number of psychological issues that required treatment, and Tonya had acted
out inappropriately, violently and sexually.  Yet Mother denied to the
psychologist that any of her children had problems.  Kevin, who had never lived
with Mother, had recently shown signs of attachment, but he still disengaged
with Mother by the end of her visitation.  At the time of trial, the children
were in a foster home with foster parents who were addressing the children’s
issues.  Davis testified that the foster home was a possible permanent adoptive
placement.

Based
on the evidence presented at trial and considering the relevant statutory and Holley
factors, we hold that, in light of the entire record, the court could have
reasonably formed a firm conviction or belief that termination of Mother’s parental
rights was in the children’s best interest.  We overrule Mother’s fourth issue.

Conclusion

Having
overruled Mother’s dispositive issues, we affirm the judgment of the trial
court. 

 

LEE GABRIEL
JUSTICE

 

PANEL:  GARDNER,
WALKER, and GABRIEL, JJ.

DELIVERED:  July 19, 2012









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for all of
the children throughout this opinion.  See Tex. R. App. P. 9.8(b)(2).





[3]The trial court also
terminated K.E.’s parental rights to Kevin.  It did not terminate R.C.’s
parental rights to Ryan or Tonya.  Neither father is a party to this appeal.





[4]The final order of
termination was signed on August 16, 2011.  Because the order was signed before
September 1, 2011, former section 263.405(i) controls this case.  See
Act of May 5, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348,
349 (deleting subsection (i) but noting that former section
263.405 is still in effect for final orders rendered before September 1,
2011).





[5]R.C. is not Kevin’s
father, and the State noted at trial that there was no pleading on file in
which R.C. requested custody of Kevin.  R.C.’s fiancée testified that their
first home study did not meet CPS’s requirements for Kevin.





[6]The trial began on April
25, 2011 but after the day’s testimony, it was recessed until May 18, 2011, and
then again until June 2, 2011.





[7]Mother testified that she
thought she could not have possession of Ryan and Tonya while her CPS case was
still open.